## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIM BUTLER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 15-545** |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security,** | : | |
| **Defendant.** | : | |

### REPORT AND RECOMMENDATION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                        **July 5, 2016**

Plaintiff, Kim Butler, brought this counseled action pursuant to 42 U.S.C. § 405(g), moving for summary judgment and seeking review of the Commissioner of the Social Security Administration's decision denying her claims for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1382–1383 (the "Act").  The matter is before the Court for a Report and Recommendation.  For the reasons set forth below, I respectfully **RECOMMEND** that Plaintiff's request for review be **DENIED**.

### I.       PROCEDURAL HISTORY

Plaintiff was born on September 12, 1967 and was forty-five years old as of the date the decision denying her application for SSI benefits.  (R. 28, 140-43, 151).  Plaintiff has a tenth grade education and past relevant work as a counter attendant.  (R. 28, 43, 158).

Plaintiff filed for SSI on August 15, 2011, alleging disability since July 1, 2008 due to high blood pressure, seizures, congestive heart failure, blood clots, asthma, bleeding ulcers,

anemia, manic depression, schizophrenia, bipolar disorder, and right eye cataracts.[1]  (R. 157-58).

Plaintiff's SSI application was initially denied by the Bureau of Disability Determination on

December 19, 2011.  (R. 90-94).  Following Plaintiff's timely request, (R. 95-98), a hearing was

held before an administrative law judge ("ALJ") on April 20, 2013, at which Plaintiff,

represented by an attorney, and a vocational expert ("VE"), appeared and testified.  (R. 33-73).

After the hearing, the record remained open and additional evidence was submitted and

considered.  (R. 15, 493-708).

On July 15, 2013, the ALJ issued a decision finding Plaintiff not disabled and not entitled

to benefits under the Act.  (R. 15-29).  Plaintiff filed a request for review with the Appeals

Council.  (R. 10, 167-70).  On December 16, 2014, the Appeals Council denied Plaintiff's

appeal, thereby making the ALJ's decision the final decision of the Commissioner.  (R. 1-6).

Plaintiff subsequently filed this action to appeal the Commissioner's decision.  (ECF No. 8).  The

Commissioner has filed a Response, (ECF No. 12), and Plaintiff has filed a Reply, (ECF No. 13).

The matter has been assigned to the Honorable Joseph F. Leeson, Jr., who has referred to

it to me for a Report and Recommendation.  (Order, ECF No. 14).


## II.    FACTUAL BACKGROUND[2]

The record reflects that Plaintiff was treated by Dr. Farnaz Shahzad, Dr. Leo Zacharias,

Dr. Raymond Coleman, and other physicians at Mercy Health Associates, beginning in 2009.

---

[1]  At the administrative hearing, Plaintiff amended her disability onset date to August 15, 2011, the date of her SSI application.  (R. 37).

[2]  Plaintiff asserts disability based on multiple physical and mental impairments.  (R. 157-58).  However, her only allegations of error involve the ALJ's assessment of her mental impairments and her seizure disorder; accordingly, while the Court has reviewed the 764-page administrative record in its entirety, the following focuses only on those portions of the record relevant to Plaintiff's instant claims.

(R. 232-359).  At her Initial Visit questionnaire, completed on March 6, 2009, Plaintiff

complained of seizures and anemia.  (R. 290).  Plaintiff also reported past recreational drug use.

(*Id.*).  Subsequently, Plaintiff indicated that she used crack cocaine until February 2009.  (R. 382,

481).

On June 27, 2009, Plaintiff was admitted to the hospital for complaints of chest pain and

shortness of breath.  (R. 365-73).  Plaintiff reported that she had a seizure; however, it was

determined that she was non noncompliant with Dilantin, her anti-seizure medication.  (R. 373-

74).  After her discharge from the hospital on June 30, 2009, Plaintiff saw Dr. Zacharias for an

office visit.  (R. 289).  He advised Plaintiff to stay on Dilantin as prescribed.  (*Id.*).  At

subsequent check-ups in 2009, Dr. Zacharias continued to advise Plaintiff to remain on Dilantin,

and told her to see a neurologist.  (R. 283, 285, 287-88).

In December 2009, Plaintiff complained of pain in the right wrist and hand following a

seizure.  (R. 277-78, 282).  She was referred to orthopedic surgeon Dr. Menachem Meller,[3] who

found no evidence of trauma or other abnormality.  (R. 277-78.).  In a letter to Dr. Zacharias in

January 2010, Dr. Meller observed that Plaintiff had "addictive tendencies and numerous red

flags of inappropriate illness behavior," including multiple drug allergies.  (R. 277).  He stated

that providing Plaintiff with Percocet for her pain, as Plaintiff requested, would be "poorly

advised."  (*Id.*).  Dr. Meller found no further orthopedic treatment to be necessary.  (R. 278).

In February 2010, Dr. Shahzad saw Plaintiff for complaints of gum and mouth pain.  (R.

279).  His treatment notes state: "Plaintiff . . . only wants Percocet. . . . Plaintiff was told to

f[ollow] u[p] [with] dental for further medical, as this is the last time I am prescribing 30

Percocets for this purpose.  And she can see someone else if she wants narcotics as I will not

---

[3]  Dr. Meller previously performed surgery on Plaintiff's right wrist in June 2009.  (R.
413-14).

prescribe it." (*Id.*).  In May 2010, Plaintiff saw Dr. Shahzad with complaints of seizures.  (R. 255).  She was negative for blurred vision, dizziness, double vision, head trauma, vision loss, or other neurological signs.  (R. 255).  Dr. Shahzad found her unspecified epilepsy to be "stable" and referred her to neurology.  (R. 256).  In July 2010, Plaintiff saw Dr. Coleman for complaints of chronic headaches related to her seizures, which were not relieved by over-the-counter medications.  (R. 258).  Dr. Coleman scheduled an MRI, but refused to prescribe Vicodin as requested.  (R. 259).  At appointments with her treating physicians in 2011, Plaintiff's seizure disorder was observed to be "stable."  (R. 255, 263, 271).

On October 16, 2012, Plaintiff was referred by Dr. Zacharias to Dr. Ali Mahta, a neurologist at Temple Neurology Associates, for worsening headaches, seizures, and neck pain. (R. 459-64).  Dr. Mahta's neurological examination was unremarkable; he recommended that Plaintiff attend physical therapy for her neck and continue to take her anti-seizure medications. (R. 463).  Plaintiff underwent a brain MRI on October 25, 2012.  (R. 440).  The impression was vasculitis, most likely related to Plaintiff's history of cocaine use, though other etiologies were not entirely ruled out.  (*Id.*).  Additionally, the MRI revealed a chronic microhemorrhage in the left superior frontal centrum semiovale, which was also attributed to Plaintiff's past cocaine use. (*Id.*).  At a follow-up visit with Dr. Mahta on December 18, 2012, Plaintiff reported that she had not performed physical therapy for her neck.  (R. 452).  Dr. Mahta diagnosed Plaintiff with muscle contraction headaches, referred her to physical therapy, and prescribed Gabapentin, an additional anti-seizure medication.  (R. 454).

On December 24, 2012, Dr. Zacharias increased Plaintiff's dose of Dilantin.  (R. 623). Plaintiff had a brain CT scan on December 27, 2012, which revealed "nonspecific white matter disease."  (R. 676).  On February 21, 2013, Dr. Zacharias noted that Plaintiff's Dilantin level had been low, and added Keppra as an additional anti-seizure medication.  (R. 616).  On March 5,

4

2013, Dr. Zacharias saw Plaintiff for complaints of occipital headaches.  (R. 611-13).  He found no neurological deficits and no ocular symptoms.  (R. 613).

On March 14, 2013, Plaintiff was examined by Dr. Simon Wali of Mercy Health for her seizure disorder and complaints of headaches.  (R. 482-87).  Dr. Wali's neurological examination revealed that Plaintiff was alert and oriented, with intact memory and cranial nerves, no sensory loss, and no motor weakness.  (R. 486).  Her balance, gait, and coordination were intact, Plaintiff retained normal motor skills, and her reflexes were normal.  (*Id.*).  In his clinical assessment, Dr. Wali observed that there was a "very strong suspicion of psychogenic component" to Plaintiff's ongoing seizures.  (*Id.*).  He referred Plaintiff for an EEG, stating that if the EEG was normal, Plaintiff would require "prolonged monitoring with or without video."  (*Id.*).  On April 3, 2013, Plaintiff underwent a neurological EEG, which revealed "normal background activity present in both hemispheres with alpha waves present bilateral.  There is no focality to it suggestive for a structural brain lesion."  (R. 489).   The interpreting physician, Dr. Valeria Serban, stated that the EEG correlated to Plaintiff's clinical status because Plaintiff is a known epileptic, but "she has no active seizures" when compliant with her medication.  (*Id.*).  Dr. Serban recommended that Plaintiff continue taking her anti-seizure medications as prescribed.  (*Id.*).

With regard to Plaintiff's alleged mental impairments, the record reflects that Plaintiff received mental health treatment at MedNet from February 2009 to early January 2011.  In a Comprehensive Bio-Psychosocial Evaluation completed on April 21, 2009, Plaintiff stated that she had stopped working due to medical problems, and her resulting financial problems were causing her depression and anxiety.  (R. 183).  Plaintiff reported no prior substance use, and stated that in her free time, she liked to read, write, and babysit.  (R. 184).  The interviewer observed Plaintiff to be appropriate in appearance, cooperative, and to have normal speech, mood and affect.  (R. 188).  Plaintiff was diagnosed with depressive disorder not otherwise

specified ("NOS"), anxiety disorder NOS, and given a Global Assessment of Functioning ("GAF") score of 45.[4]  (*Id.*).  The recommended treatment was psychotherapy and medication management, with long term of goals of reducing depression by developing coping skills, reducing anxiety by "thinking less of personal problems," and taking care of her physical health. (R. 197).

Due to poor reproduction quality, the psychiatric progress notes from MedNet are only partially legible; however, they reveal that in May 2009, Plaintiff's mood was depressed and anxious, she was reportedly experiencing delusions and hallucinations, and her behavior was hyperactive.  (R. 220).  However, in September 2009, Plaintiff stated that "everything is fine;" she was observed to be cooperative, with normal mood, speech, and affect, and appropriate thought and appearance.  (R. 216).  Her behavior, speech, mood, thought, affect and appearance remained largely normal in 2010, and it was noted that she was psychologically stable when compliant on medication.  (R. 199, 206, 209-11).  At a regular office visit with Dr. Shahzad in March 2010, Plaintiff was "negative for psychiatric symptoms."  (R. 254).  The last record evidence from MedNet was a Treatment Plan signed by Plaintiff on January 7, 2011, approximately seven months before her alleged disability onset date.  (R. 189-91).

In April 2011, Dr. Shahzad found Plaintiff to be "alert and oriented" and noted "no unusual anxiety or evidence of depression."  (R. 263).  Approximately one month later, Dr.

---

[4]  "A GAF score is a 'numerical summary of a clinician's judgment of [an] individual's overall level of functioning . . .'"  *Rivera v. Astrue*, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014) (quoting *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).  "The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two."  *Carl v. Colvin*, No. 3:15-CV-00895-GBC, 2016 WL 2736079, at *2 n.4 (M.D. Pa. May 11, 2016).  "A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning."  *Lee v. Colvin*, 2014 WL 2586935, at *2 n.1 (E.D. Pa. 2014).

Shahzad observed that Plaintiff oriented to time, place, person, and situation and her affect was normal. (R. 267). He further noted:

> The patient is negative for anhedonia, is not anxious, does not exhibit compulsive behavior, behaves appropriately for age, has normal knowledge, has normal language, is not in denial, is not euphoric, is not fearful, does not have flight of ideas, is not forgetful, does not have thoughts of grandiosity, denies hallucinations, denies hopelessness, does not have increased activity, is not having memory loss, has no mood swings, has no obsessive thoughts, does not have paranoia, has normal insight, exhibits normal judgment, has normal attentions span and concentration, does not have pressured speech, and does not have suicidal ideation.

(*Id.*). Plaintiff was referred to a psychiatrist for any needed treatment. (*Id.*). Plaintiff's mental impairments were not mentioned in subsequent appointments with Dr. Shahzad on June 8, 2011 or Dr. Zacharias on July 8, 2011. (R. 269-74).

Dr. Eli Sapol saw Plaintiff for a consultative examination at the behest of the Bureau of Disability Determination on November 15, 2011. (R. 430-38). In his narrative report, Dr. Sapol recounted that Plaintiff was the victim of sexual abuse as a child, and had been in physically abusive relationships as an adult. (R. 431). She reported ongoing nightmares and feelings of guilt. (*Id.*). Dr. Sapol observed that Plaintiff spoke rapidly, was tearful, and appeared anxious; however, he noted that Plaintiff stated that she "feels better lately." (R. 431). In his mental status examination, Dr. Sapol found Plaintiff to be alert and cooperative and appropriately groomed, with no evidence of hyperactivity or lethargy, normal thought processes, and logical, relevant, and goal-directed associations. (R. 433-34). Plaintiff denied hallucinations and was fully oriented with respect to time, place and person. (*Id.*). Dr. Sapol found Plaintiff's attention span and ability to concrete to be "fair," and found no obvious impairment in recent or remote memory functioning. (*Id.*). However, he found Plaintiff to be anxious and agitated during the

session, with a labile affect.  (*Id.*).  Dr. Sapol diagnosed Plaintiff with Mood Disorder, NOS and Posttraumatic Stress Disorder ("PTSD") and assigned her a GAF score of 58.[5]

Following his examination, Dr. Sapol completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (R. 437-39).  He found Plaintiff slightly impaired in her ability to understand, remember, and carry out short and simple instructions, and moderately impaired in her ability to do so for detailed instructions or to make judgments on simple, work-related decisions.  (R. 437).  By way of medical and clinical findings supporting this assessment, Dr. Sapol wrote:  "Plaintiff is anxious and preoccupied with her medical and emotional problems."  (*Id.*).  Dr. Sapol additionally found Plaintiff to be moderately impaired with regard to all aspects of responding appropriately to supervision, co-workers, and work pressure in a routine work setting, listing as support "debility of mood" and medical issues.  (*Id.*).

On November 17, 2011, two days after Dr. Sapol's examination, Plaintiff appeared at the emergency department complaining of swollen feet and nasal congestion.  (R. 541-45).  A psychiatric exam conducted at the hospital found Plaintiff to be alert and oriented, with normal affect, judgment, insight, concentration, and remote and recent memory.  (R. 604).  Plaintiff was given Percocet for her pain.  (R. 544-45).  On November 28, 2011, Plaintiff again appeared at the emergency department with complaints of dental and facial pain.  (R. 535).  Her psychiatric examination revealed the same findings as above.  (R. 538).

 On December 16, 2011, Dr. Peter Garito completed a Psychiatric Review Technique based on his review of the record, including Dr. Sapol's examination and Plaintiff's MedNet treatment notes.  (R. 77-82).  Dr. Garito opined that Plaintiff had an affective disorder and

---

[5]  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  *Garcia v. Colvin*, No. 3:15-CV-0171, 2016 WL 1695104, at *4 n.8 (M.D. Pa. Apr. 26, 2016) (citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000)).

anxiety-related disorder, but found that these impairments caused only mild restriction in activities of daily living, and moderate restriction in maintaining social functioning or concentration, persistence and pace. (R. 78). In support of this determination, Dr. Garito found that Plaintiff's outpatient treatment notes did not indicate a deficit in mental status, and that she was open, alert, friendly and cooperative in her assessment with Dr. Sapol. (*Id.*). Dr. Garito completed a Mental Residual Functional Capacity assessment, in which he opined that Plaintiff was moderately limited in her ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; get along with coworkers and peers for extended periods; and respond appropriately to changes in the work setting. (R. 79-81). In all other respects, he found her only slightly or not at all impaired. (*Id.*). Dr. Garito noted that Plaintiff could take care of her personal needs, live independently, read and write well, and maintain friendships. (R. 81). He stated "[t]here is nothing in file to indicate that [Plaintiff would not be able to make decisions, attend regularly, understand and follow directions or would need special supervision." (*Id.*). Ultimately, he opined that Plaintiff retained the ability to perform simple, routine, repetitive tasks in work-type settings. (*Id.*).

Plaintiff was not in mental health treatment between January 2011 and February 2013. Dr. Zacharias' treatment notes during that time continue to document anxiety as a chronic symptom, and recommend that Plaintiff see a psychiatrist. For instance, on July 10, 2012, Dr. Zacharias observed that Plaintiff's mental health diagnoses were unclear, but that her symptoms were worsening since she was off medication and out of treatment. (R. 646). He renewed her prescriptions for Risperdal and Xanax, and referred Plaintiff to a psychiatrist. (*Id.*). On September 9, 2012, he stated that he was treating Plaintiff's anxiety with "Xanax as needed" but that she needed to "follow up with psych." (R. 639). Dr. Zacharias continued to prescribe psychiatric medication, including Xanax, Risperdal, and Zoloft, while recommending that

Plaintiff see a psychiatrist.  (R. 607-27).  Plaintiff's emergency department visits in 2012 reveal

normal psychiatric findings.  (R. 531, 523).  On July 9, 2012, Plaintiff denied anxiety or other

psychiatric symptoms at the emergency department when she appeared with complaints of foot

or ankle injury.  (R. 520, 523).

Plaintiff began mental health treatment at CATCH, Inc. on February 5, 2013.  (R. 587-

97).  In a Comprehensive Biopsychosocial Evaluation, Plaintiff was observed to be angry and

irritable, with organized logical thoughts, full affect, and poor insight and judgment.  (R. 591).

She was alert and oriented, but reported intermittently hearing voices and having problems

getting along with others.  (*Id.*).  Plaintiff was diagnosed with a Mood Disorder NOS and bipolar

disorder, and given a GAF score of 40.[6]  (R. 591).  Plaintiff attended approximately four therapy

sessions at CATCH.  (R. 588-89).  In April 2013, she informed hospital staff at the emergency

department that she was not under psychiatric care.  (R. 497).  Plaintiff returned to CATCH for

two sessions in June 2013, reporting anxiety due to losing custody of her daughter and the death

of one of her son's fathers.  (R. 585-86).  However, as of June 11, 2013, Plaintiff informed staff

at the emergency department that she was not receiving psychiatric treatment.  (R. 603).  A

psychiatric exam at the hospital on that date revealed that Plaintiff was alert and oriented, with

normal affect, judgment, insight, concentration, and remote and recent memory.  (R. 604).

## III.    LEGAL STANDARD

To receive SSI benefits, a claimant must demonstrate an "inability to engage in any

---

[6]  "A GAF score of 31–40 represents some impairment in reality testing or
communication or major impairment in several areas, such as work or school, family relations,
judgment, thinking or mood."  *Carl*, 2016 WL 2736079, at *2 n.4.  The Court notes that pages
one and four of the Comprehensive Biopsychosocial Evaluation are omitted from the record.

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  The Act

requires that a claimant for disability benefits show that she has a physical or mental impairment

of such a severity that:

> [S]he is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in
> any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the
> immediate area in which [s]he lives, or whether a specific job
> vacancy exists for [her], or whether [s]he would be hired if [s]he
> applied for work.

42 U.S.C. § 1382c(a)(3)(B).  A five-step sequential evaluation process is used to determine

eligibility for disability benefits:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If [s]he is not,
> then the Commissioner considers in the second step whether the
> claimant has a "severe impairment" that significantly limits h[er]
> physical or mental ability to perform basic work activities.  If the
> claimant suffers a severe impairment, the third inquiry is whether,
> based on the medical evidence, the impairment meets the criteria
> of the impairment listed in the "listing of impairments," . . . which
> result in a presumption of disability, or whether the claimant
> retains the capacity to work.  If the impairment does not meet the
> criteria for a listed impairment, then the Commissioner assesses in
> the fourth step whether, despite the severe impairment, the
> claimant has the residual functional capacity to perform h[er] past
> work.  If the claimant cannot perform h[er] past work, then the
> final step is to determine whether there is other work in the
> national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).  The claimant bears the burden of

establishing steps one through four, and then the burden shifts to the Commissioner at the fifth

step to establish that the claimant is capable of performing other jobs in the national economy, in

light of her age, education, work experience, and Residual Functional Capacity ("RFC").  *Poulos*

*v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).  RFC is defined as the most an

individual can still do despite her limitations.  20 C.F.R. §§ 416.945(a)(1), 404.1545(a)(1).

Judicial review of a denial of disability benefits is limited to determining whether there is

substantial evidence to support the Commissioner's decision.  *Johnson v. Comm'r of Soc. Sec.*,

529 F.3d 198, 200 (3d Cir. 2008); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000); *Hartranft v.*

*Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence "does not mean a large or

considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is a

deferential standard, requiring "less than a preponderance" and only "more than a mere

scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir.

1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Rutherford v. Barnhart*,

399 F.3d 546, 552 (3d Cir. 2005).

Though the court's duty is "to scrutinize the record as a whole to determine whether the

conclusions reached [by the ALJ] are rational," *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d

Cir. 1979), the court may not undertake *de novo* review of an ALJ's decision, nor may it re-

weigh the evidence of record.  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (A

reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those

of the factfinder."); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

However, the Court has plenary review of legal issues.  *Schaudeck v. Comm'r. of Soc. Sec.*, 181

F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)); *see also Friedberg v. Schweiker*, 721

F.2d 445, 447 (3d Cir. 1983) ("[E]ven if the Secretary's factual findings are supported by

substantial evidence, [a court] may review whether the Secretary, in making his findings, applied

the correct legal standards to the facts presented.") (internal quotation omitted).

**IV.    THE ALJ'S DECISION**

In his July 25, 2013 disability decision, the ALJ found at step one that Plaintiff had not

engaged in substantial gainful activity since August 15, 2011, the application date.  (R. 17).

At step two, the ALJ found that Plaintiff had the following severe impairments: seizure

disorder and mood disorder NOS.  (*Id.*).  The ALJ found that Plaintiff's alleged impairments of

hypertension, chest pain, asthma, bilateral knee pain, bilateral ankle pain, and right wrist pain

status post open reduction internal fixation ("ORIF") were non-severe impairments because they

did not cause more than minimal limitations in her ability to perform work-related activities,

because Plaintiff did not follow recommendations to see specialists for many impairments, and

because Plaintiff's pain complaints were inconsistent, and she received pain medication from

various providers.  (R. 17-18).  The ALJ further found at step two that Plaintiff's alleged gout

was not a medically determinable impairment.  (R. 19-20).

At step three, the ALJ concluded that Plaintiff did not have an impairment or

combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  (R. 20).  The ALJ then found at step four that Plaintiff had the

following RFC:

> [C]laimant has the residual functional capacity to perform light
> work as defined in 20 CFR 416.967(b), except that she requires
> seizure precautions and is limited to simple, routine, repetitive
> work performed primarily on her own, not as part of a team, in a
> predictable low stress environment.

(R. 22).  Based on this RFC and the testimony of the VE, the ALJ found at step four that Plaintiff

was unable to perform her past relevant work as a counter attendant.  (R. 28).

The ALJ proceeded to step five, and determined based on the testimony of the VE that

there existed other jobs in the national economy that Plaintiff was able to perform despite her

RFC.  (R. 28-29).  Accordingly, the ALJ reached step five of the disability determination and concluded that Plaintiff was not disabled under the Act.


V.     **DISCUSSION**

In her motion for summary judgment and request for review, Plaintiff alleges that the ALJ erred in failing to find her anxiety disorder and PTSD were severe impairments at step two, (Pl. Br. 2-7); failed to consider all relevant probative evidence in the record, including GAF scores and evidence related to her seizure disorder, (*id.* at 7-11); gave undue weight to the assessments of non-treating physicians Dr. Sapol and Dr. Garito, (*id.* at 11-13); and failed to include all credibly established limitations in the hypothetical to the VE, (*id.* at 13-15).  Plaintiff additionally contends that her case should be remanded to the ALJ for the consideration of new evidence.  (*Id.* at 15-17).

The Court shall first address Plaintiff's request that this matter be remanded for new evidence, and then address her various allegations of ALJ error.  For the reasons that follow, I conclude that a new evidence remand is not merited.  Further, I respectfully recommend that Plaintiff's request for review be denied, as substantial evidence supports the ALJ's reasoning, and the decision is free of harmful legal error.

A.     **Remand for Consideration of New Evidence**

Plaintiff contends that this matter should be remanded for the consideration of new evidence submitted to the Appeals Council.  (Pl. Br. 15-17).

When a claimant seeks to rely on evidence that was not before the ALJ, a court has the option to remand the case to the Commissioner for consideration of that evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).

14

Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finklestein*, 496 U.S. 617, 626 (1990).  Evidence is material if it "relate[s] to the time period for which benefits were denied and does not concern evidence of a later acquired disability, or of the subsequent deterioration of a previously non-disabling condition," and "there is a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak v. Sec'v of Health and Human Servs*., 745 F.2d 831, 833 (3d Cir. 1984).  The disability claimant bears the burden of demonstrating that the evidence is new, material, and that good cause exists for her failure to timely submit to the ALJ.  *Id.* (noting that it is the claimant who must demonstrate that the requirements have been met).

The first piece of new evidence proffered by Plaintiff is comprised of 359 pages of hospital records from Mercy Philadelphia Hospital dated from January 15, 2014 to July 4, 2014. (*Id.* at 16; Pl. Br. Exs. 1-5, ECF Nos. 8-1–8-5).  The hospital records indicate, in relevant part, that Plaintiff had a breakthrough seizure while hospitalized on April 4, 2014, and an EEG on April 25, 2014 revealed focal epilepsy in the right frontal lobe.  (Pl. Br. Ex. 1 at 51-52, ECF No. 8-3; Pl. Br. Ex. 3 at 47, ECF No. 8-3).  The Appeals Council did not include this evidence in the record, finding that it related to a later time and did not affect whether Plaintiff was disabled on or before July 25, 2013, the date of the ALJ's adverse disability decision.  (R. 2).  Respondent asserts that Plaintiff has failed to meet the materiality standard with regard to this evidence, and that there is no reasonable probability that this new evidence would change the ALJ's decision. (*Id.*).

Considering the above principles, remand for consideration of the 2014 hospital records is not merited.  First, Plaintiff has failed to demonstrate that those records relate back to the time period under consideration by the ALJ.  Plaintiff's hospital records begin on January 15, 2014,

thereby post-dating the relevant time period for SSI in this matter of August 15, 2011 (the application date) through July 25, 2013 (the date of the ALJ's decision) by approximately seven months. *See, e.g.*, *Frye v. Colvin*, No. 14-1022-GMS, 2016 WL 2758259, at *7 (D. Del. May 12, 2016) (hospital records from two months after the ALJ's decision did not relate back); *Kirkland v. Colvin*, No. CV 13-5441, 2016 WL 1608487, at *3 (D.N.J. Apr. 22, 2016) (medical evidence post-dating relevant SSI period by three months did not relate back). Second, the records state that Plaintiff had a long history of epilepsy, and at the time of her seizure in April 2014, she was non-compliant with her medication. (Pl. Br. Ex. 1 at 51-52). Plaintiff fails to show how this seizure event or the subsequent EEG relates back to her condition during relevant time, rather than merely documenting a subsequent change in her condition due to her documented non-compliance with her medication regime.

In any event, even if the April 2014 seizure and EEG were to relate back, there is not a reasonable probability that these records would change the outcome of the ALJ's decision. Plaintiff contends that new evidence would change the result because the ALJ doubted that she actually suffered from such a seizure disorder, and the April 2014 provides objective evidence that she did. (Pl. Br. 16; Pl. Reply Br. 10). However, the ALJ plainly gave Plaintiff the benefit of the doubt in this respect, as he found at step two that her seizure disorder was a severe, medically determinable impairment; thoroughly reviewed the medical evidence pertaining to her seizures; and included seizure-related limitations in the RFC. (R. 17, 23-24). The new evidence would not change this result, since it is cumulative of the information before the ALJ. The hospital records and EEG, which indicate that Plaintiff was a known epileptic who often failed to take her anti-seizure medication, tracks the findings of the April 2013 EEG of Dr. Serban, who observed that Plaintiff had a nine-year history of epilepsy and needed to continue consistently taking her prescription medications to treat this condition. (R. 489). Accordingly, Plaintiff has

failed to show a reasonable probability of a different result on remand if the ALJ were to consider the 2014 hospital records.

The second piece of new evidence is Plaintiff's prescription records from Walgreens and Sunray Drugs, dated from January 4, 2012 to September 25, 2013, indicating that she was prescribed the antipsychotic medication Risperidone, among other medications.  (Pl. Br. 16-17). Remand is also not merited for consideration of this evidence because Plaintiff has not shown good cause for failing to provide this information to ALJ prior to his hearing.  *See Morgan v. Colvin*, No. 15-527, 2016 WL 1319720, at *3 n.5 (W.D. Pa. Apr. 5, 2016) (declining to remand for consideration of new evidence where the plaintiff did not show good reasons for failing to provide the evidence directly to the ALJ).  Second, even if Plaintiff could articulate some good reason for failing to present this evidence, the evidence is not material.  The record already documents Plaintiff's various prescriptions, including her prescription for Risperidone, (R. 432, 461, 549, 552, 562, 570, 570), and thus these additional medication logs are cumulative of the record evidence before the ALJ.  Lastly, Plaintiff has failed to demonstrate a reasonable probability of a different result were the Court to remand for reconsideration of the medication logs, since the ALJ noted Plaintiff's various prescriptions, including her prescription for Risperidone, in the decision.  (R. 25-27).

For these reasons, I respectfully recommend that Plaintiff's request for remand for consideration of new evidence be denied.

### B.     Failure to Find Impairments Severe at Step Two

Plaintiff next argues that the ALJ committed error at step two in failing to address whether her anxiety disorder and PTSD constituted severe impairments.  (Pl. Br. 3-7).  The Commissioner responds that any error that may have arisen at step two was harmless, because the ALJ found other impairments to be severe, continued with the analysis, and adequately

considered all of Plaintiff's mental impairments at subsequent steps.  (Resp. 5-8).  I find the Commissioner's argument persuasive.

At step two, the ALJ has to "consider the medical severity of a claimant's impairment(s)."  20 C.F.R. § 416.920(a)(4)(ii).  The step-two inquiry is a "*de minimis* screening device to dispose of groundless claims."  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-61 (3d Cir. 2004) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003)).  To be considered severe, an impairment must significantly limit the claimant's physical or mental ability to do "basic work activities."[7]  20 C.F.R. § 404.1520(c).  A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of her age, education, or work experience.  *See Bowen v. Yuckert*, 482 U.S. 137, 149-51 (1987).

A claimant who does not have a severe impairment is not considered disabled.  20 C.F.R. § 416.920(c).  Thus, an erroneous determination at step two that a claimant has no severe impairments would be grounds for remand, because the sequential evaluation process is prematurely cut short.  *See Newell*, 347 F.3d at 546 (an erroneous finding of no severe impairments at step two necessitated a remand).  However, so long as the ALJ finds in the plaintiff's favor at step two and continues on with the analysis, the failure to find an impairment to be severe is generally harmless.  *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford*, 399 F.3d at 553); *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262 n.2 (3d Cir. 2006) (stating that "Rivera also argues that the ALJ committed errors in the second step, but the ALJ found in her favor at that step (holding that she

---

[7]  The mental ability to do "basic work activities," requires understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

did have a severe impairment), so any such errors were harmless.") (not precedential).  Even if

an ALJ erroneously fails to mention an impairment at step two, the ultimate decision may still be

supported by substantial evidence so long as the ALJ considers the effects of that impairment at

steps three through five.  *See, e.g.*, *John v. Colvin*, No. 15-197, 2016 WL 3057654, at *4 (W.D.

Pa. May 31, 2016) (harmless error where ALJ did not address low back impairment at step two

because ALJ found claimant to have other severe impairments and considered Plaintiff's low

back impairment in determining the RFC); *Desando v. Astrue*, No. 3:CV-07-1823, 2009 WL

890940, at *5 (M.D. Pa. Mar. 31, 2009) (harmless error where ALJ failed to consider

fibromyalgia at step two); *Roberts v. Astrue*, Civil No. 8-625, 2009 U.S. Dist. LEXIS 91559 at *

5 (W.D. Pa. Sept. 30, 2009) ("Even assuming that the ALJ failed to include all of the Plaintiff's

severe impairments at step two, this would be harmless error, as the ALJ did not make his

disability determination at this step.").

In this case, Plaintiff takes issue with the ALJ's failure to find that her diagnosed

impairments of anxiety disorder and PTSD were "severe impairments."  Yet, Plaintiff did not

allege disability on the basis of anxiety or PTSD in her disability application, nor did Plaintiff

testify that she suffered from either alleged impairment.  (R. 157, 50-53).  Rather, when asked

why she was unable to work, Plaintiff testified to difficulty breathing, inability to get out of bed

due to leg swelling, hallucinations, and seizures.  (R. 51-54).  Even assuming that Plaintiff's

PTSD and anxiety were properly before the ALJ, any error he may have committed in failing to

consider these impairments at step two was harmless, since he found Plaintiff's seizure disorder

and mood disorder NOS to be severe impairments and continued with the analysis.

Contrary to Plaintiff's argument, the record reveals that the ALJ fully considered and

accounted for Plaintiff's anxiety symptoms at subsequent steps of the analysis.  In a thorough,

three-page review of the medical evidence pertaining to Plaintiff's mental health impairments,

the ALJ observed that Plaintiff's treatment history for her allegedly disabling mental health impairments was sporadic.  (R. 25-28).  However, the ALJ acknowledged that Plaintiff received mental health treatment at MedNet in 2009 and 2010 — prior to the alleged disability onset date — where she was diagnosed with anxiety disorder.  (R. 25) (citing R. 181-230).  The ALJ observed that, after Plaintiff stopped treatment at MedNet in 2010, Dr. Zacharias often attempted to refer Plaintiff for psychiatric care in light of her persistent complaints of anxiety, but she did not seek treatment until February 2013.  (R. 26) (citing R. 607-55).  The ALJ correctly noted that Plaintiff was diagnosed with a mood disorder and bipolar disorder at CATCH, and prescribed Xanax, Zoloft, Trazodone and Risperdal.  (*Id.*) (citing R. 585-97).  However, as the ALJ observed, Plaintiff did not remain in treatment at CATCH for a significant period of time; she stopped attending in April 2013 before briefly resuming care in June.  (R. 27).

The ALJ also thoroughly reviewed the opinion evidence relating to Plaintiff's mental impairments, which consisted exclusively of Dr. Sapol's Medical Source Statement in November 2011, and Dr. Garito's Disability Determination Explanation in December 2011.  (R. 27).  The ALJ observed that Dr. Sapol diagnosed Plaintiff with a mood disorder and PTSD.  (R. 25-26) (citing R. 430-34).  Ultimately, he gave great weight to Dr. Sapol's assessment that Plaintiff's mental impairments at most caused only moderate limitations in her ability to perform work-related mental activities.  (R. 27) (citing R. 437).  The ALJ also noted that Dr. Garito found Plaintiff to have medically determinable impairments of affective disorder and an anxiety-related disorder.  (R. 22).  He gave great weight to Dr. Garito's determination that Plaintiff retained the ability to perform simple, routine, repetitive tasks in work-type settings, because he found it was consistent with Plaintiff's testimony, her lack of consistent treatment and the record as a whole.  (*Id.*) (citing R. 74-82).  Ultimately, the ALJ opined that Plaintiff's mental illnesses caused her moderate impairment in maintaining social functioning and concentration, persistence and pace,

20

and that those findings were accounted for in the RFC limiting Plaintiff to simple, routine, repetitive work performed primarily on her own, not as part of a team, in a predictable low stress environment.  (R. 27).

Plaintiff argues that the ALJ's failure to find that anxiety disorder and PTSD were severe impairments impacted the RFC analysis.  She asserts that because the ALJ "did not even consider anxiety to be a mental health diagnosis," he discounted her complaints of anxiety as being only situational in nature.  (Pl. Br. 6-7, Reply Br. 3).  This is unpersuasive.  As the foregoing reveals, the ALJ acknowledged that Plaintiff alleged, and was treated for, anxiety throughout the relevant disability period.  The ALJ noted that when Plaintiff returned to therapy at CATCH in June of 2013, she reported anxiety "due to ongoing medical/financial and familial stressors," including trying to gain custody of her daughter.  (R. 588).  However, the ALJ did not fail to consider or address the limitations arising from her anxiety merely because part of the evidence suggested that the impairment might be situational in nature.  Rather, the ALJ relied upon the opinions of Dr. Sapol and Dr. Garito, the only medical sources in the record to offer opinions as to Plaintiff's mental functional capacity, to reach his RFC determination.  Both of these physicians opined that Plaintiff's mental impairments, including her anxiety and/or PTSD, did not preclude her from performing all work-related activities.  Therefore, Plaintiff's argument that the ALJ's failure to address her anxiety impairments at step two requires remand because it impacted the RFC is without merit.  Accordingly, I respectfully recommend that Plaintiff's request for reconsideration of the ALJ's step two finding be denied.

### C. Consideration of the Record Evidence

Next, Plaintiff asserts that the ALJ misinterpreted and failed to consider all relevant record evidence in deriving the RFC.  (Pl. Br. 7-11).  Specifically, she contends that the ALJ

failed to discuss all of the GAF scores in the record, and failed to address all relevant record evidence pertaining to her seizure disorder.  (Pl. Br. 7-11).

       **1.**       **GAF Scores**

The record in this case contains the following GAF scores: a score of 45 upon Plaintiff's intake at MedNet on April 21, 2009, (R. 188, 197), which was reiterated in treatment plan updates on April 26, 2010, (R. 194), August 20, 2010, (R. 192), and January 7, 2011 (R. 191); a score of 58 given by Dr. Sapol on November 15, 2011, (R. 434); a score of 40 upon in her intake at CATCH on February 5, 2013, (R. 591); and a score of 50 in her comprehensive treatment plan at CATCH on March 18, 2013, (R. 587).  The ALJ only explicitly addressed Plaintiff's score of 58 assessed by Dr. Sapol, which he stated correlated to "moderate symptoms," and her score of 40 upon intake at CATCH, which he observed referred to "serious symptoms."  (R. 26). However, he generally acknowledged that Plaintiff was given "low scores" at MedNet and Catch.  (R. 27).  Plaintiff argues that the ALJ's failure to explicitly consider all of her GAF scores, particularly her scores of 45 at CATCH, requires remand.

The GAF scale is "used by mental health professionals to 'assess current treatment needs and provide a prognosis.'"  *Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006) (quoting 66 Fed. Reg. 50746, 50764-65 (2000)).   However, as the Third Circuit has explained, "[a] GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings."  *Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009) (not precedential); *see also* 65 Fed. Reg. 50746, at 50764-65 (2000).  In fact, in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), published in May 2013, the American Psychiatric Association abandoned the GAF scale as a measurement tool.  *See Solock ex rel. F.A.R.P v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (explaining that DSM-V abandoned the GAF scale "[d]ue to concerns about

subjectivity in application and a lack of clarity in the symptoms to be analyzed.").  Nonetheless,

GAF scores are still medical evidence and must be considered as such.  *Holdsworth v. Colvin*,

No. CV 15-188, 2016 WL 1660181, at *2 (W.D. Pa. Apr. 27, 2016); *see also Nixon v. Colvin*,

No. 14-4322, 2016 WL 3181853, at *2-3 (E.D. Pa. June 7, 2016).  "This standard does not . . .

create or imply a bright-line rule that a case must be remanded if the ALJ failed to address any

GAF scores." *Nixon*, 2016 WL 3181853, at * 3.  Rather, the relevant consideration is whether

the ALJ "conduct[ed] a thorough analysis of the medical evidence regarding plaintiff's mental

impairments . . . such that the ALJ properly addressed the issues on which plaintiff's GAF

scores were based." *Id.* (internal quotations omitted).

     In this case, Plaintiff's argument revolves around the ALJ's failure to expressly consider

her GAF scores of 45 assessed at MedNet, and her score of 50 assessed at CATCH.  The ALJ did

not directly acknowledge these scores; however, citing to the exhibits containing Plaintiff's

treatment records, the ALJ observed that Plaintiff was assessed with "low GAF scores" at those

facilities.  (R. 27).  He then explained:

> [T]hese scores are not indicative of the [Plaintiff's] ongoing
> functional level.  The scores were assigned at the beginning of
> treatment or during periods of extreme events causing [Plaintiff's]
> exacerbation of symptoms.  No scores have been assigned after
> [Plaintiff] has consistently sought and been compliant with
> treatment for an extended period, which would be the true
> indicator of [Plaintiff's] functioning level.  Therefore, the above
> GAF scores have been considered and are given little weight.

(R. 27).  Plaintiff argues that remand is required because the ALJ failed to consider all relevant

GAF scores, and that substantial evidence does not support his reasoning for disregarding her

lower scores.  (Pl. Br. 7-10).  Neither contention is persuasive.

     First, the Court is satisfied that the ALJ properly considered Plaintiff's GAF scores in this

case.  Contrary to Plaintiff's argument that remand is *per se* required when an ALJ fails to

address scores under 50, recent cases decided within this Circuit have held that the relevant

consideration is whether the ALJ considered the evidence in which the score appeared.  *See, e.g.*,

*Hartung v. Colvin*, No. CV 12-6155, 2016 WL 2910096, at *6 (E.D. Pa. May 19, 2016) (finding

no error where ALJ did not specifically address GAF score of 50 where ALJ discussed report in

which the score appeared); *Conley v. Colvin*, No. CV 15-261, 2016 WL 1255315, at *1 n.1

(W.D. Pa. Mar. 31, 2016) (no error where ALJ failed to address GAF score of 50 where ALJ

reviewed examination and findings which formed the basis for that GAF score); *Ayala v. Colvin*,

No. CV 12-3326, 2015 WL 5544750, at *6 (E.D. Pa. Sept. 15, 2015) (cases do not necessarily

require remand when the ALJ discusses the medical records in which the GAF determination

appears or explains his consideration of other GAF scores in the same range) (citing *Rios v.

Astrue,* Civ. No. 09–5004, 2010 WL 3860458, at *8) (E.D. Pa. Sept. 30, 2010), *aff'd,* 444 F.

App'x. 532 (3d Cir. 2011) (failure to discuss two GAF scores under 50 did not require remand

where ALJ discussed another score in that range).  In this case, the ALJ discussed the evidence

from CATCH and MedNet, and was plainly aware that practitioners at those facilities gave

Plaintiff low GAF scores.  The decision reveals that he evaluated those records and explained

that the low GAF scores included therein were entitled to little weight because they did not

reflect Plaintiff's progress over time, or with regular treatment.  Additionally, he discussed

Plaintiff's GAF score of 40, which is lower than the omitted scores of 45 and 50, and correctly

acknowledged that it represented serious symptoms.  Therefore, remand for reconsideration of

the omitted GAF scores is not required.

Furthermore, substantial evidence supports the ALJ's determination that Plaintiff's low

GAF scores were not entitled to significant weight because they did not reflect her status after

consistent treatment.  Plaintiff was given a GAF score of 45 in her intake evaluation at MedNet

in April 2009.  (R. 188).  Due to poor reproduction quality, Plaintiff's psychiatric progress notes

from MedNet are not completely legible, but a psychiatrist's report from November 2010, after approximately a year and half of consistent treatment, appears to give Plaintiff a GAF score in the fifties.  (R. 203).  By contrast, the score of 45 reappears, without context or explanation, in three treatment plan and treatment plan updates in 2009, 2010, and 2011.  (R. 189-97).  Thus, though the MedNet treatment records are internally contradictory, they do indicate some improvement in functioning after a period consistent therapy and psychiatric treatment, as the ALJ found.[8]  Both of Plaintiff's GAF scores assessed by CATCH likewise demonstrate Plaintiff's functioning after minimal, or no, psychiatric care.  As the ALJ observed, the score of 40 given upon intake at CATCH in February 2013 occurred when Plaintiff had not been in dedicated mental health treatment for approximately two years.  (R. 591).  Thereafter, Plaintiff failed to appear for her initial therapy session on March 1, 2013.  (R. 591).  As of the date of her Comprehensive Treatment Plan on March 18, 2013, when she was given a GAF score of 50, Plaintiff had attended two sixty-minute therapy sessions on March 6 and March 11, 2013, and had been prescribed medication from a psychiatrist only as of March 6, 2013.  (R. 588, 597).  Thus, the second CATCH GAF score was also assessed after a very limited treatment period, supporting the ALJ's determination that these scores were not truly indicative of Plaintiff's functioning when she was consistently receiving mental health treatment.

---

[8]  In any event, since a GAF score is a snapshot of an individual's difficulty in functioning at the time of the evaluation, the MedNet scores are of limited, if any, relevance to Plaintiff's functional abilities during the period under consideration by the ALJ because they predate that period by at least seven months.  *See, e.g., Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *15 (M.D. Pa. Feb. 23, 2016); *Clayton v. Colvin*, No. 14-400, 2014 WL 5439796, at *7 (W.D. Pa. Oct. 24, 2014); *McCormick v. Astrue*, 2010 WL 1740712, at *6 (D. Del. April 30, 2010).  Therefore, even if substantial evidence does not support the ALJ's stated reasoning for giving the MedNet scores little weight, Plaintiff has not shown that this error was harmful and requires remand.  *See Shineski v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (citations omitted)); *see also Holloman v. Comm'r Soc. Sec.*, No. 15-2293, 2016 WL 475976, at *4 n.3 (3d Cir. Feb. 8, 2016) (applying *Shinseki* in the Social Security context).

Accordingly, the Court finds the ALJ appropriately considered the GAF scores of record, and substantial evidence supports his reasoning as to why certain of these scores were due little weight. Therefore, remand for reconsideration of Plaintiff's GAF scores is not merited.

### 2.  Evidence of Seizure Disorder

Plaintiff further argues that the ALJ failed to consider evidence pertaining to her seizure disorder. (Pl. Br. 10-11). This argument is unpersuasive.

First, though Plaintiff asserts that the ALJ expressed skepticism about the existence of her seizures, she fails to identify any particular record evidence the ALJ failed to address. (*Id.* at 11). Rather, she relies on the new evidence submitted to this Court to assert that the ALJ was impermissibly doubtful as to whether she in fact had a seizure impairment. (*Id.*). However, as noted *supra*, this Court cannot consider any evidence that was not part of the record before the the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001) ("No statutory provision authorizes the district court to make a decision on the substantial evidence standard based on new and material evidence never presented to the ALJ."); *see also Dunson v. Comm'r Soc. Sec.*, 615 F. App'x 65, 67 (3d Cir. 2015) (not precedential). Insofar as Plaintiff relies on new evidence to assert that the ALJ overlooked record evidence of her seizure impairment, this argument fails.

Furthermore, this Court has carefully reviewed the administrative record and finds that the ALJ comprehensively evaluated the record evidence pertaining to Plaintiff's seizure disorder. In deriving the RFC, the ALJ found that Plaintiff's seizure disorder "has consistently been monitored by her primary care physician and intermittently by differing neurologists, and the [Plaintiff] has been prescribed multiple medications." (R. 23). The ALJ then thoroughly reviewed the objective medical evidence pertaining to this impairment, including the results of the 2012 MRI attributing Plaintiff's vasculitis and chronic microhemmorhage to her history of cocaine use. (R. 23-24). The ALJ further noted that Plaintiff reported ongoing seizures in

March 2013, but it was believed that there may be suspected a "psychogenic component."  (R. 24).  Thus, the ALJ did not discredit or disbelieve that Plaintiff had a seizure disorder, as she asserts, but rather accurately noted that Plaintiff's physicians believed that her seizure disorder may have had a psychological, rather than physical, origin.  The Court discerns no error with the ALJ's consideration of the record evidence pertaining to her seizure disorder.

Therefore, I respectfully recommend that Plaintiff's request for remand because the ALJ failed to consider all relevant evidence be denied.

### D.    Consideration of Non-Treating Physician Opinions

Next, Plaintiff argues that substantial evidence does not support the RFC determination because the ALJ gave great weight to the opinions of Dr. Garito and Dr. Sapol.  (Pl. Br. 12-13). Plaintiff argues that both physicians offered their opinions in 2011, before Plaintiff was assessed at CATCH, and therefore these opinions did not accurately reflect her degree of impairment at the time of the ALJ's decision.  (*Id.*).  Plaintiff notes that her records at CATCH document symptoms such as hallucinations, irritability, and difficulty getting along with others.  (Reply Br. 8-9).  Further, she points out that at the time of Dr. Sapol's evaluation, she had custody of her daughter, whereas at the time of her treatment at CATCH, she had lost custody of this child, demonstrating deterioration in her functional ability.  (*Id.* at 9).  The Commissioner responds that this argument lacks merit, as Plaintiff essentially asks the Court to reweigh the opinions and supplant the ALJ's determination with its own.  (Resp. 9-13).

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  The Regulations provide special deference to medical opinions from treating sources, *see id.* §

416.927(c)(2); however, where, as here, there is no treating source opinion entitled to controlling weight, the ALJ must weigh the medical opinions according to the factors set forth in 20 C.F.R. § 416.927(c).  Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of any other factors which "tend to support or contradict the opinion."  *Id.* § 416.927(c).  The Court reviews the ALJ's assessment of non-treating medical opinions under the deferential substantial evidence standard.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir.1994).  As long as the ALJ explains in the decision the weight given and a reasonable person would find the evidence adequate to support the stated reasoning, the Court will uphold the ALJ's assignment of weight to a non-treating source opinion.

In this case, the ALJ assigned "great weight" to Dr. Sapol's opinion that Plaintiff had slight limitation in understanding, remembering and carrying out simple instructions, and moderate limitation in understanding, remembering and carrying out detailed instructions, making judgments on work-related decisions, interacting appropriately in a work-setting, and responding to routine work pressures, because Dr. Sapol's opinion was "consistent with the results of [Dr. Sapol's] clinical psychological disability evaluation and with treatment notes for her primary care physician and her new treating psychiatrist."  (R. 27).  The ALJ gave Dr. Garito's opinion great weight because it was "consistent with the claimant's testimony, her lack of consistent treatment, and the record as a whole."  (R. 27).

Substantial evidence supports the ALJ's weighing of these non-treating source opinions. First, Dr. Sapol's clinical examination is consistent with both his and Dr. Garito's opinion.  He observed that though Plaintiff was anxious, depressed, hyper-talkative, and tearful, her thought processes were normal, her associations were normal, her attention span and ability to concentrate were fair, her judgment and insight were fair, and she showed no memory impairment.  (R. 434).  After reviewing Plaintiff's treatment history and based upon his personal observation, Dr. Sapol assessed Plaintiff with a GAF score of 58, which indicates moderate symptoms.  *See Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 534 n.3 (3d Cir. 2011) ("A GAF score of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.") (internal citation omitted).  Likewise, the records from Plaintiff's primary treating source physician, Dr. Zacharias, support the ALJ's determination that Dr. Garito and Dr. Sapol's findings were entitled to great weight.  Dr. Zacharias observed that Plaintiff had chronic anxiety and as well as other possible mental impairments, such as bipolar disorder or schizophrenia, but he did not instruct Plaintiff to restrict her activities in any respect, nor did he offer an opinion as to how these impairments might impede Plaintiff's functional ability.  Rather, he managed her prescriptions and recommended that she seek dedicated psychiatric treatment, which Plaintiff failed to do for approximately two years.  (R. 651, 646, 638-39, 632, 630, 623, 609).  In late January 2013, just prior to Plaintiff beginning treatment at CATCH, Dr. Zacharias observed that Plaintiff was negative for psychiatric symptoms, but nonetheless renewed her prescription for Xanax.  (R. 618-19).  Additionally, the opinions of the non-treating sources are consistent with the record as a whole.  For instance, Plaintiff routinely had negative psychiatric examinations when she presented at the emergency department for various issues.  (R. 604, 535). Thus, there is substantial evidence to support the ALJ's finding that Plaintiff's mental

impairments caused no more than moderate functional limitations, as determined by Drs. Sapol and Garito.

The thrust of Plaintiff's argument is that her treatment notes at CATCH cannot be reconciled with the opinions of Drs. Sapol and Garito, since the CATCH records document additional, more severe symptoms that were not present in 2011 when these physicians issued their opinions. However, substantial evidence supports the ALJ's finding to the contrary. Plaintiff's psychiatric progress notes at CATCH are not entirely legible, but they reveal that Plaintiff had an angry outburst in late February 2013 because the psychiatrist refused to renew her prescription for Xanax ahead of her scheduled appointment. (R. 594). Plaintiff was offered an earlier appointment, but did not show up. (*Id.*). On March 6, 2013, the psychiatrist found Plaintiff was doing "fairly well" despite her reports of racing thoughts and nightmares. (R. 594-95). On March 27, 2013, Plaintiff's mood was observed to be "intense, but neutral," and on April 24, 2013, her mood was "good." (R. 595). Plaintiff failed to attend her scheduled appointment on May 22, 2013; when she spoke to her psychiatrist on June 5, 2013, she was upset because one of her son's fathers had recently died. (*Id.*). She reported high levels of anxiety, but was not observed to be anxious. (*Id.*). Plaintiff's therapy notes at CATCH are also handwritten and not fully legible, but reveal that Plaintiff was alert and oriented times three, with a normal mood and affect at her sessions on March 6 and March 11, 2013. (R. 588). On March 18, 2013, the therapy notes reflect that Plaintiff reported ongoing personal problems, and was anxious. (R. 586). She reported using prayer and keeping busy to cope, and that therapy was helping. (*Id.*). At an unscheduled session on April 14, 2013, Plaintiff's mental status was unchanged. (*Id.*). Her therapist recommended that she keep all scheduled appointments and use breathing exercises. (*Id.*). When Plaintiff resumed treatment for two sessions in June 2013, she was observed to be anxious, depressed, and irritable, but she rated her anxiety as less than at previous

30

sessions, and was experiencing stressors such as the loss of custody of her daughter and medical problems.  (R. 595).  Thus, even though portions of the CATCH records may have documented different or additional symptoms than those known to Drs. Sapol and Garito, they also provide substantial evidence that supports the ALJ's determination that Plaintiff was only moderately limited by her mental impairments.

Accordingly, substantial evidence supports the ALJ's determination that the opinions of Drs. Sapol and Garito were entitled to great weight.  I respectfully recommend that Plaintiff's request for remand on this issue be denied.

### E.    Inclusion of all Limitations in RFC and Hypothetical

Lastly, Plaintiff argues that the ALJ failed to include all impairment-related limitations in the RFC assessment and hypothetical to the VE.  (Pl. Br. 13-15).

In steps four and five of a disability determination, "a [VE] . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R. § 416.960(b)(2).  The purpose of posing a hypothetical is to determine whether a claimant has the RFC to perform either the claimant's previous work or any work that exists in the national economy.  *Ramirez v. Barnhart*, 372 F.3d 546, 549 (3d Cir. 2004).  The ALJ's hypothetical "must accurately convey to the [VE] all of a claimant's credibly established limitations" in order to rely upon the VE's testimony as substantial evidence.  *Rutherford*, 399 F.3d at 554.

In this case, the ALJ determined that Plaintiff retained the RFC to perform light work "except that she requires seizure precautions and is limited to simple, routine, repetitive work

performed primarily on her own, not as part of a team, in a predictable low stress environment."

(R. 22).  Based on this RFC, the ALJ posed the following hypothetical to the VE:

> [S]he's a younger individual with a high school education and at most a limited unskilled work background.  . . . Let's say light work exertionally with seizure precautions. . . . Let's say simple, routine, repetitive work, and performed primarily on her own, not as part of a team.  Say an unpredictable, low stress environment.

(R. 69).  The VE testified that an individual with those limitations could not perform Plaintiff's

past work as a counter attendant, but could perform other work in the regional economy, such as

the job of housekeeper or an internal (non-postal) mail clerk.  (R. 69-70).  The ALJ then asked

the VE if any jobs were available to an individual with seizure precautions and the same

limitations as indicated by Dr. Sapol, and the VE responded affirmatively, explaining that those

limitations were similar to the first hypothetical.  (R. 71).

Plaintiff first argues that the hypothetical to the VE was deficient because it did not

account for all of her credibly-established limitations.  (Pl. Br. 13-14).  Specifically, she argues

that the RFC and the resultant hypothetical limiting her to simple, routine, repetitive work

performed primarily on her own, in a low stress environment, did not sufficiently account for the

ALJ's finding at step three that she had "moderate difficulties" in social functioning and

"moderate difficulties" in concentration, persistence, and pace.  (*Id.*).  Thus, the Court must

determine whether the phrasing employed by the ALJ in his hypothetical and RFC assessment —

"simple, routine, repetitive work performed primarily on her own, not as part of a team, in a

predictable low stress environment"— is sufficient to convey the moderate limitations in

concentration, persistence, or pace, and social functioning, found by the ALJ at step three.

Limitations in broad functional areas are used at a number of steps in the disability

determination process for different reasons.  *See* SSR 96–8p, 1996 WL 374184, at *4 (July 2,

1996) (explaining "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are

not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process").  At steps two and three, limitations in broad functional areas are used to determine the severity of a claimant's mental impairment.  *See id.* at *4.  In the work capacity assessment at steps four and five, these limitations need to be accounted for through specific physical functions that adequately convey what a claimant is able to do at work. 20 C.F.R. § 416.945(c) (describing process by which an ALJ "first assess[es] the nature and extent of [claimant's] mental limitations and restrictions and then determine[s] [claimant's] [RFC] for work activity on a regular and continuing basis.").  Indeed, in the precedential Third Circuit decision of *Ramirez v. Barnhart*, the Court explained that findings of limitation in the broad functional areas, though not an RFC assessment, play a role in steps four and five, and thus need to be accounted for the RFC and hypothetical to the VE.  372 F.3d at 555.

In *Ramirez*, the ALJ posed a hypothetical limiting the claimant to (among other restrictions), "simple one or two step tasks."  *Id.* at 554.  In response, the VE testified that Ramirez could perform the jobs of assembler, packer, and inspector, all of which had daily production quotas and pace requirements that the claimant, Ramirez, would have to maintain.  *Id.* The Third Circuit held that the hypothetical limiting the claimant to one-to-two step tasks was not sufficient to account for the ALJ's observation at steps two and three that Ramirez "*often* suffered from deficiencies in concentration, persistence, or pace."  *Id.* (emphasis added).  The Court explained that the record contained the testimony of a medical expert ("ME") — upon whose testimony the ALJ relied — who stated that Ramirez's ability to finish tasks was dependent on her proximity to her children, as she had anxiety disorder attributable to her need to protect them.  *Id.*  Thus, the Third Circuit reasoned that the VE's response to the hypothetical might have changed had the ALJ accurately conveyed Ramirez' pace limitation.  *Id.* at 554-55.

Plaintiff relies on *Ramirez* and cases applying its holding that limitations at steps two and three must be accounted for in the RFC and hypothetical, but *Ramirez* is distinguishable on its facts. In *Ramirez*, it was significant that the claimant "often" experienced the relevant limitations due to the nature of anxiety disorder, as demonstrated by the testimony of the VE.[9] *Id.* at 555. Here, by contrast, there is no record evidence, and Plaintiff points to no record evidence, demonstrating additional, specific deficiencies in concentration, persistence and/or pace, or social functioning, that were not adequately conveyed by the hypothetical limiting her to simple, routine, repetitive work. Moreover, the ALJ in this case included additional limitations in the RFC and hypothetical not present in *Ramirez*. The ALJ limited Plaintiff to positions that allowed her to work primarily on her own, with few outside distractions, and the limitation to "simple, routine work," is broader than *Ramirez*'s "simple one or two-step tasks." Finally, unlike *Ramirez*, Plaintiff's counsel did not elicit testimony from the VE as to whether the jobs the VE identified required daily production quotas or a degree of pace to maintain employment.

In this case, the ALJ accounted for Plaintiff's moderate impairment in concentration, persistence, or pace, and social functioning by limiting her to simple, routine tasks, in an isolated setting. Indeed, following *Ramirez*, courts including the Third Circuit have found hypotheticals

---

[9] Since *Ramirez* was decided, the Social Security Administration has revised the scale used to rate the degree of broad functional limitation. The old scale, considered by the Court in *Ramirez*, was based on the frequency that a limitation would impact a claimant's activities (never, seldom, often, frequent, constant), 20 C.F.R. § 416 .920a(b)(3) (1999), while the current scale (used by the ALJ in this case) rates the overall severity of the limitation itself (none, mild, moderate, marked, extreme), 20 C.F.R. § 416.920a(c)(4). The Third Circuit has not commented as to whether there is a correlation between the points on the frequency scale and the points on the severity scale, which may call into question the ongoing applicability of *Ramirez*; nonetheless, courts within this Circuit continue consider *Ramirez'* broader holding that steps two and three findings need to be accounted for in the RFC and VE hypothetical to be valid and binding precedent. *See, e.g.* *Green v. Colvin*, No. 14-1942, 2016 WL 1696797, at *3 (E.D. Pa. Apr. 27, 2016); *Orndorff v. Colvin*, No. 114-02465, 2016 WL 1458408, at *12 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted*, No. 1:14-CV-2465, 2016 WL 1450172 (M.D. Pa. Apr. 13, 2016); *Winters v. Comm'r of Soc. Sec.*, No. 15-01357, 2015 WL 8489958, at *10 (D.N.J. Dec. 9, 2015).

like the one used in this case appropriate under similar circumstances.  *See McDonald v. Astrue,* 293 Fed. App'x 941, 946 85 n.10 (3d Cir. 2008) (hypothetical that included limitation to "simple, routine tasks" was sufficient to account for moderate restrictions in concentration, persistence, and pace because unlike in *Ramirez,* the claimant did not "often" suffer from these deficiencies) (not precedential); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) (ALJ's hypothetical limiting claimant to "simple routine tasks" accounted for moderate limitations in concentration, persistence, and pace) (not precedential); *Winters v. Comm'r of Soc. Sec.*, No. 15-01357 (KM), 2015 WL 8489958, at *9 (D.N.J. Dec. 9, 2015) (distinguishing *Ramirez* and finding hypothetical limiting Plaintiff to simple, routine work with no public contact and occasional coworker and supervisory contact sufficient to account for moderate limitations in concentration, persistence, and pace); *Drevas v. Colvin*, No. CV 1:15-194-RGA, 2015 WL 7575494, at *11 (D. Del. Nov. 25, 2015) (ALJ accounted for claimant's moderate impairment in concentration, persistence, or pace through limitation to "simple, routine tasks.").  Consequently, the ALJ's hypothetical adequately conveyed Plaintiff's functional limitations.

Plaintiff further argues that the hypothetical to the VE was deficient because the ALJ failed to specify the limitations included in the phrase "seizure precautions."  (Pl. Br. 14-15). Plaintiff's argument is not persuasive, as courts within this Circuit have found no error where an ALJ limits a claimant to light work "with standard seizure precautions," even if the ALJ does not specifically define what those precautions exclude.  *See, e.g. Leidy v. Astrue*, No. 06-3944, 2007 WL 2254413, at *3 (E.D. Pa. Aug. 2, 2007).  Indeed, it is commonly understood that the usual seizure precautions preclude exposure to heights or use of machinery.  *See, e.g.*, *Rivera v. Colvin*, No. CV 14-6176, 2016 WL 1720423, at *2 (E.D. Pa. Apr. 29, 2016); *Day v. Astrue*, No. 09-6045, 2010 WL 4780771, at *2 (E.D. Pa. Nov. 22, 2010); *Fink v. Astrue*, No.. 08-1330, 2009 WL 839022, at *3 (E.D. Pa. Mar. 30, 2009).

In any event, even if the ALJ should have defined "seizure precautions" for the VE, Plaintiff has failed to demonstrate that there is a conflict between the RFC requiring seizure precautions and the jobs identified by the VE.   Plaintiff argues that the job of housekeeper "includes hanging drapes . . . which *could* involve use of a ladder" and that the job of mail clerk "*can* involve loading or unloading from a conveyer which is a moving machine that could be prohibited by seizure precautions," (Pl. Br. 15), but this is highly speculative argument.  Indeed, the court notes that VEs in other cases have identified jobs akin to those identified in this case as appropriate for individual claimants requiring standard seizure precautions.  *See, e.g.*, *Colgan v. Astrue*, No. 09-0938, 2009 WL 8581179, at *2 (E.D. Pa. Aug. 11, 2009), *report and recommendation adopted*, No. 09-0938, 2012 WL 752083 (E.D. Pa. Mar. 7, 2012) (VE testified that claimant "permitted all necessary seizure precautions" (among other limitations) could perform job as housekeeper and non-postal mail clerk); *Rivera v. Barnhart*, No. 04-2102, 2005 WL 713347, at *3 (E.D. Pa. Mar. 24, 2005) (VE testified that individual with "standard seizure precautions" could be employed as a light housekeeper); *Vantine v. Barnhart*, No.. 04-131-JJF, 2005 WL 106796, at *7 (D. Del. Jan. 11, 2005) (claimant with seizure precautions able to perform her past relevant work as hotel cleaner).

Accordingly, I find that substantial evidence supports the ALJ's determination that jobs exist in significant numbers in the economy that Plaintiff could perform.  I respectfully recommend that remand for reconsideration of his alleged errors in the hypothetical to the VE be denied.

## VI.    CONCLUSION

After careful review of the ALJ's decision, the record, and the parties' arguments, I find that substantial evidence supports the ALJ's decision, it is free from harmful legal error, and

remand for the consideration of new evidence is not appropriate.  Therefore, I make the

following:

**RECOMMENDATION**

AND NOW, this __5th__ day of July, 2016, it is RESPECTFULLY RECOMMENDED

that and Plaintiff's request for review be DENIED, as set forth herein.


BY THE COURT:


   __/s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE